IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE


| | | |
|---|---|---|
| IN THE MATTER OF | ) | |
| THE LAST WILL AND TESTAMENT OF | ) | C.A. No. 8024-ML |
| WILMA B. KITTILA | ) | |


MASTER'S REPORT
(Post-Trial)


Date Submitted:  October 21, 2014
Draft Report:  January 29, 2015
Final Report:  February 18, 2015


Scott E. Swenson, Esquire, of CONNOLLY GALLAGHER LLP, Wilmington, Delaware; Attorney for Petitioners.

Richard H. Cross, Jr., Esquire, of CROSS & SIMON, LLC, Wilmington, Delaware; Attorney for the Executor.


LEGROW, Master

The family members of an elderly widow became estranged from her during a series of events that culminated in a guardianship proceeding more than a decade ago in this Court. After her neighbors were appointed her guardians by order of this Court, the woman revised her estate plan twice, both times excluding the family members who petitioned for guardianship and who previously were the primary beneficiaries of her estate. Those family members now challenge the validity of two wills executed by their aunt. The challenged wills left the residue of the decedent's estate to a combination of the guardians, two other friends, and charitable organizations. The petitioners contend that the wills are invalid for one of three reasons: (1) the decedent lacked testamentary capacity at the time she executed the wills, (2) the decedent was unduly influenced to dispose of her estate in the manner reflected in the challenged wills, or (3) the terms of the guardianship order precluded the decedent from making a will, rendering her legally incapable of revising her estate plan.

The petitioners' case is not without merit. Among other things, although it is plain that the family's decision to pursue guardianship drove a irreparable wedge between them and their aunt, it appears more likely than not that the decedent already intended to revise her will and exclude the family as beneficiaries before the guardianship petition was filed. No coherent, definitive explanation for that decision has been offered. Ultimately, however, I conclude that the absence of an explanation for that decision is not sufficient to invalidate the decedent's will because the petitioners have failed to demonstrate by a preponderance of the evidence that the decedent lacked testamentary capacity or was

unduly influenced at the time she executed her last will. This is my final report after trial and post-trial briefing.

## BACKGROUND

These are the facts as I find them after trial. Wilma B. Kittila ("Wilma" or the "Decedent")[1] was married to Richard Kittila ("Dick") and resided in Hockessin, Delaware on Mill Creek Road for the majority of the events at issue in this case. Wilma and Dick had no children. The witnesses at trial described Wilma as independent, particular, opinionated, and relatively private about her life and her belongings.[2] She liked things done in a certain way and placed substantial value on her ability to control her life.

### A. The Kittila Family

Allan Kittila ("Allan") was Dick's nephew and therefore was Wilma's nephew by marriage. Allan was married to Karen Kittila ("Karen"), and Allan and Karen had four children, Christopher Kittila ("Chris"), Theodore Kittila ("Ted"), Kathleen Kittila Beaulieu ("Kathy"), and Timothy Kittila ("Tim"). Karen and Chris are the petitioners in this action.

Allan, Karen, and their children enjoyed a close relationship with Wilma and Dick that dated back to Allan's childhood. Wilma and Dick would vacation and celebrate holidays with Allan, Karen, and their children, and when the Kittila children attended college at the University of Delaware they regularly visited Wilma and Dick at their

---

[1] I use certain individuals' first names for the sake of clarity. No disrespect is intended.
[2] *In re Will of Wilma B. Kittila*, C.A. No. 8024-ML (Apr. 30-May 2, 2014) (TRIAL TRANSCRIPT) (hereinafter "Tr.") at 56-58 (Ted), 127-28 (Karen), 421 (C. Leach).

home in Hockessin. Until shortly before the events that precipitated the guardianship proceedings, Wilma expressed great fondness for Allan, Karen, and the Kittila children.[3] In March 1994, Wilma named Allan as her alternate attorney-in-fact in the event Dick was unable to serve in that capacity.[4]

## B. Wilma's 1994 Will

Dick passed away unexpectedly in a home accident on Labor Day weekend in 1994.[5] Wilma never remarried and came to rely on Allan and Karen for help with her finances and maintaining her home.[6] Shortly after Dick's death, Wilma revised her estate plan, executing a new will along with a new durable power of attorney. The power of attorney (the "1994 POA") named Allan as Wilma's attorney-in-fact and designated Karen as the alternate agent in the event Allan was unable to serve.[7] Wilma's last will and testament (the "1994 Will") named Allan, Karen, and their four children as the residuary beneficiaries of her estate.[8] Wilma gave Allan and Karen a copy of the 1994 Will to keep in their safe.[9]

## C. The Guardianship Proceeding

During 2000 and 2001, members of the Kittila family began to notice some changes in Wilma's behavior and demeanor. Wilma became more forgetful, needed frequent reminders about appointments, and left notes around the house to remind her of

---

[3] *Id.* at 7-12, 15-16 (Ted).
[4] Joint Exhibit ("JX") 23.
[5] Joint Pre-Trial Stipulation and Order ("Pre-Tr. Order") ¶ II(6).
[6] *Id.* ¶II(4).
[7] JX 25.
[8] JX 24, Article FOURTH.
[9] JX 117 at 5-6.

things, including seemingly intuitive items such as "Lock Door" and "Light Switch On."[10] Wilma also employed a number of "handymen" to assist with various projects around her home, which was located on a 3-acre wooded property. Wilma told the Kittilas that one such man was a convicted murderer who had been sent back to prison on charges of domestic violence.[11] On another occasion, Wilma refused to pay a landscaping company and was sued for non-payment, which Ted helped her resolve.[12] Wilma also made strange accusations that people were stealing her tools and siphoning gas from her car.[13] Perhaps most alarmingly, she became fixated on animals coming into her garden and on one occasion discharged a gun in her house to get rid of an animal and ended up shooting her windowsill instead.[14]

In 2002, Wilma started exhibiting anger and resentment toward Allan for reasons she never articulated clearly to Allan or the other Kittilas. Seemingly out of nowhere, Wilma began making vague accusations that Allan had done something and described him as "evil" and "vindictive."[15] When pressed by Ted about her change of feelings, Wilma related a story that had happened six or seven years earlier on a trip she took to a wolf museum in Minnesota with Allan and Karen. Wilma refused to see or speak to Allan, but she continued to treat the remaining members of the family warmly.[16] Medical records from the same time period indicate that Wilma expressed anger and frustration

---

[10] Tr. at 15-16, 57 (Ted), 95-96 (Karen).
[11] *Id.* at 17 (Ted).
[12] *Id.* at 18-19 (Ted).
[13] *Id.* at 16, 60 (Ted).
[14] *Id.* at 16-18 (Ted).
[15] *Id.* at 20-22 (Ted), 98-100 (Karen).
[16] *Id.* at 22 (Ted), 100 (Karen).

that Allan and his family wanted her belongings and were pressuring her to move to assisted living in – she believed – an effort to get her possessions.[17] In August 2003, Allan unexpectedly received a letter in the mail, signed by Wilma and indicating that she was revoking the 1994 POA.[18]

Around the same time, Wilma began describing with increasing affection a neighbor named Boyce Fender ("Mr. Fender"), whom she called her "angel without wings."[19] Wilma told Karen, and later Ted, that Mr. Fender frequently stopped by her home to check on her and do odd jobs for her without any expectation of payment, that she had romantic feelings for Mr. Fender, and that she wished she were younger and that his wife was dead.[20] When Ted and his wife visited Wilma, alarmed by the stories they were hearing from Allan and Karen, Wilma told Ted that Mr. Fender had touched her leg and kissed her, that she wanted to give him her house, and that Mr. Fender and his wife had suggested she see Richard Franta, Esquire ("Mr. Franta"), whom Wilma described as the attorney "[the Fenders] send all their old friends to."[21] Wilma went on to insist that she needed to change her estate plans and that Mr. Fender's wife, Janet Fender ("Mrs. Fender"), had given her ideas about estate planning.[22]

Although the Kittilas only were just hearing about these ideas, Wilma already had consulted Mr. Franta to discuss estate plans. In an initial meeting on August 7, 2003,

---

[17] JX 119 at 10.

[18] JX 31 (handwritten letter dated Aug. 13, 2003).

[19] Tr. at 106-107 (Karen).

[20] *Id.* at 33 (Ted), 107-08 (Karen).

[21] *Id.* at 26-30 (Ted). Mr. Franta had previously provided legal services to Mr. Fender about unrelated matters. *See id.* at 284-85 (Franta).

[22] *Id.* at 30-32 (Ted).

Wilma spoke lovingly of all the Kittilas, other than Allan, and indicated that she wanted to name Karen and the four children as residuary beneficiaries in her will while revoking the 1994 POA naming Allan as her agent.[23] Mr. Franta advised Wilma how to revoke the power of attorney.[24] Wilma told Mr. Franta that she would like to name Mr. Fender as her new agent under a power of attorney, but she was concerned he would refuse to do so out of reluctance to interfere in family issues.[25] In this initial meeting, Wilma also stated she wanted her new will to give Mr. Fender a "right of first offer" to purchase Wilma's home from the estate for fair market value.[26]

Wilma and Mr. Franta met again on August 13, 2003 to exchange additional information about Wilma's estate plans. Although it is not entirely clear from the record, it appears more likely than not that by the time of this meeting Wilma had decided to disinherit all of the Kittilas, including the four children.[27] Mr. Franta's notes do not indicate that Wilma expressed any desire or intent to leave any portion of her estate to the Fenders, other than the right of first offer regarding her home.[28] Mr. Franta does recall, however, that Wilma informed him at or around this meeting that Mr. Fender was willing to serve as her agent under a power of attorney.[29] Mr. Franta, who met with Wilma on at least two occasions and who is an experienced estate attorney, had no concerns about Wilma's testamentary capacity, describing her as a "relatively spry" and "spunky"

---

[23] JX 18; Tr. at 266-68 (Franta).

[24] Tr. at 273 (Franta).

[25] *Id.* at 287-88 (Franta).

[26] JX 18.

[27] *See* JX 19 (crossing out the names of the 4 Kittila children for whom she was instructed to provide an address); Tr. 271, 276 (Franta).

[28] Tr. at 289-90 (Franta).

[29] *Id.* at 269-272 (Franta).

woman who found her way to his office without assistance and expressed firmly and coherently what she wanted to do regarding her estate.[30]

The Kittila family, however, was alarmed by Wilma's statements to Ted and Karen, which were out-of-character and involved a man they did not know. The family therefore consulted legal counsel. The day after his meeting with Wilma, Ted also made an anonymous call to Adult Protective Services ("APS"), raising concerns that Wilma was being exploited.[31] The APS case manager who was assigned to the case conducted a home visit with Wilma, administered a Folstein Mini-Mental State Examination ("MMSE"), and posed questions regarding potential exploitation. Wilma flatly denied that Mr. Fender was exploiting her or that he ever had asked her for money. Wilma offered her own version of her dispute with Allan and stated that it stemmed from her revocation of the 1994 POA, Allan's requests that Wilma give him her dining room table, and her perception that – in substance – all Allan cared about was inheriting Wilma's estate.[32] Notably, during this visit, which occurred on August 25, 2003, Wilma stated that she would have designated Karen or Ted as her attorney-in-fact when she revoked the 1994 POA, but she was afraid that Allan would control their decisions if she did so.[33] After interviewing Wilma, the case manager concluded that Wilma was "able to make her

---

[30] *Id.* at 283-84, 286-88 (Franta). *See also* JX 45.
[31] JX 14 at 4.
[32] JX 14.
[33] *Id.*

own decisions and self preserve[, and] gave reasonable reasons for revoking her nephew as [durable power of attorney]."[34]

The family also contacted Wilma's primary care physician, Dr. Parul DeSai, who examined Wilma on August 22, 2003. Dr. DeSai's notes from that examination indicate that Wilma was "obsessing" about a bruise, "easily agitated, irritable, and hostile," which was "similar to past visits."[35] Wilma also scored a 29/30 on the MMSE Dr. DeSai administered.[36] After the examination, Dr. DeSai executed a physician's affidavit in which she indicated Wilma was disabled by reason of "probable delusional thought disorder; history of depression/anxiety; schizoid (paranoid) personality/affect; decreased reasoning ability."[37] Armed with Dr. DeSai's diagnosis, Karen – with the support of the rest of her family – filed a petition in this Court to be appointed as Wilma's guardian.

The guardianship petition was filed on August 27, 2003.[38] The following day, Vice Chancellor Lamb signed an order appointing Karen as Wilma's interim guardian for a period of 30 days and appointed William Garrett, Esquire as the attorney *ad litem* charged with representing Wilma's interests.[39] Karen called Wilma to notify her, for the first time, about the petition and the appointment, after which Wilma became irate and refused to speak further with Karen.[40] Karen called Wilma again on September 1, 2003. Wilma again tried to hang up, but the call did not disconnect and Karen overheard a

---

[34] *Id.* at 3.
[35] JX 33.
[36] *Id.*
[37] JX 35.
[38] JX 37.
[39] JX 38.
[40] Tr. at 110-11 (Karen).

8

conversation between Wilma and a man Karen believed was Mr. Fender.[41] Karen recorded her recollection of the call immediately after it occurred, and having heard Karen's testimony on this point I credit her memory and contemporaneous notes of what she overheard. In substance, Karen overheard Wilma and Mr. Fender discussing the guardianship and Mr. Fender advising Wilma to quickly move her funds to new accounts so Allan, Karen, and their attorneys could not find her money. To Karen, Mr. Fender seemed gleeful at the thought of tricking the Kittilas. Karen also recalls hearing Wilma and Mr. Fender exchanging "adoring" comments and agreeing that unnamed persons should not know that Wilma and Mr. Fender were meeting.[42] There is no evidence in the record, however, that Wilma made any effort to move her accounts as Mr. Fender suggested.

Wilma strongly opposed the guardianship petition and retained Suzanne Seubert, Esquire as counsel to represent her in the proceedings.[43] In connection with her opposition, Wilma also obtained a physician's affidavit from Dr. Russell Labowitz, who began treating Wilma in 2002 and opined that she was not disabled and did not need a guardian.[44] In October 2003, this Court entered an order for an independent medical

---

[41] *See* JX 40, Tr. at 114-15 (Karen). Although she had not met Mr. Fender, Karen reasonably concluded that the man she overheard was Mr. Fender after he twice referenced a woman named Janet, which is the first name of Mr. Fender's wife.
[42] JX 40.
[43] JX 47.
[44] JX 49.

examination of Wilma by Dr. Carol A. Tavani.[45] That order also permitted Wilma to be evaluated by a psychiatrist or physician of her own choosing.

Dr. Tavani interviewed Wilma and issued a report to the Court dated November 26, 2003.[46] Dr. Tavani diagnosed Wilma with dementia, probably Alzheimer's type. According to the report, Wilma arrived on time for her appointment with Dr. Tavani, but exhibited confusion in the waiting room, had difficulty finding the bathroom, and asked for water while standing next to the water cooler. Dr. Tavani reviewed some of Wilma's medical files that were available to her, though not all were, and noted that Wilma was given a diagnosis of dementia in 2001 during a stay in a rehabilitation facility after knee surgery.[47] Wilma recounted her personal history to Dr. Tavani, with some inconsistencies regarding dates, and exhibited deficits in both short term and long term memory. When pressed about her falling out with Allan, Wilma related two stories: one about the trip to the wolf museum in Minnesota, and a second about Allan becoming enraged after Wilma refused to give a toast at Ted's wedding. Dr. Tavani concluded that Wilma's cognition was "impaired," that her judgment was clouded by cognitive deficit, and that she seemed "rather guarded toward some people but perhaps insufficiently so and overly trusting toward others."[48] Dr. Tavani did acknowledge that Wilma articulated a "realistic, logical plan" regarding her living situation and her plan to move to an

---

[45] JX 53.
[46] JX 55 (Tavani 2003 Report).
[47] *Id.* at P00260.
[48] *Id.* at P00265.

assisted living facility.[49] Dr. Tavani noted the preliminary nature of her report, but concluded Wilma exhibited "cognitive decline, apparently over time, with some apparently paranoid ideation, and clearly with reactive depression."[50]

In contrast, Wilma and her attorney retained Dr. Barry W. Rovner, who provided his own report to the Court dated December 12, 2003, and who ordered neuropsychological testing that was conducted on October 28, 2003.[51] In their discussion of the falling out with Allan, Wilma's explanation was similar to what she relayed to Dr. Tavani, but Wilma elaborated that she felt Allan was motivated by his interests in her estate, rather than her well-being, and that he was controlling and dominating toward others. After reviewing the results of Wilma's testing, Dr. Rovner concluded that Wilma showed mild cognitive deficits primarily affecting her memory, but that she did not meet the criteria for major mental disorder, including dementia, because her deficits were confined to memory and did not include any other neuropsychological functions or impair her social or occupational functioning.[52] Dr. Rovner concluded Wilma did "not have a mental disorder []or impaired decision-making capability regarding who should be her beneficiaries," reasoning that Wilma had "a factual understanding of the relevant issues regarding power of attorney and her possessions and an appreciation of how these

---

[49] *Id.*
[50] *Id.* at P00266.
[51] *See* JX 13 (testing results); JX 57 (Rovner 2003 Report).
[52] JX 57 at 7.

facts pertain to her," and that she understood "the motivations that drive her decisions and their possible outcomes."[53]

As an aside, the Kittila family disputes Wilma's version of events and the timeline she recounted to Dr. Tavani, Dr. Rovner, and others about the trip to the wolf museum and the toast at Ted's wedding. Wilma repeatedly alleged that Allan became enraged when she refused to give a toast at Ted's wedding and, to punish Wilma, he made her sit in the back seat on the way to the museum and intentionally drove a round-about course so she would not have much time to spend there. In contrast, the Kittilas recall that Wilma asked to visit the wolf museum, that Allan and Karen took her there and spent several hours there, and that other facts Wilma recalled about the trip (such as the presence of Allan's mother-in-law or the fact that the trip occurred after Ted's wedding) are demonstrably false. Neither Karen nor Ted had any knowledge of Allan asking Wilma to make a toast at Ted's wedding, much less any tension that arose between Allan and Wilma when Wilma allegedly refused to do so. Karen recalled that Wilma attended the wedding and appeared to have a good time at the event and that the wedding occurred three years after the Minnesota trip. Both events occurred several years before Wilma began expressing anger toward Allan. Having reviewed the testimony, I believe the Kittilas' recollection of these events is accurate, making one of two things likely: either Wilma misremembered the sequence and actual facts of these life events, or she intentionally misconstrued the stories to justify her feelings toward Allan. What remains

---

[53] *Id.* at 8.

to be determined, however, is which is true and whether either possibility serves as a basis to upend Wilma's estate plan.

Returning to the guardianship proceeding, armed with the competing opinions of their experts, the parties recognized that their options were to work toward a settlement or litigate the merits of their positions. Eventually, almost six months after the guardianship petition was filed, the parties stipulated to a final order that appointed Wilma's long-time neighbors, Michael and Carol Leach, as permanent guardians of her person and property (the "Guardianship Order").[54] The Guardianship Order contained a number of provisions that do not typically appear in guardianship orders issued by this Court. For example, paragraph 2 of the order stated that Wilma retained "the right to legal representation and the right to participate in making decisions which affect her life and property with the final decision being reserved to the guardians."[55] In addition, Karen Kittila agreed not to request copies of the inventory, accountings, or any "other pleadings related to finances" filed with the Court, and Karen and the Kittila family agreed not to initiate contact with any facility where Wilma lived.[56] In return, the guardians agreed to confirm to Karen the status of Wilma's financial condition, convey messages between Karen and Wilma until Wilma agreed to direct contact, and "provide prompt notice to [Karen] of any significant changes in Mrs. Kittila's medical condition, hospitalizations, medical emergencies, and non-routine medical appointments." [57] In connection with the winding up of the

---

[54] Pre-Tr. Order ¶¶ (II)17-18; JX 64.
[55] JX 64 ¶ 2.
[56] *Id.* ¶ 7.
[57] *Id.* ¶¶ 7, 10.

13

guardianship proceedings, Wilma submitted an affidavit stating that she did not believe she needed a guardian, but consented to the appointment of Mr. and Mrs. Leach to bring the proceedings to a close, minimize the associated expense, and "assist [her] in the future should [Karen] or her family seek to interfere with me or my life."[58]

### D. The 2004 Will

Shortly after the Guardianship Order was signed, Wilma executed a new will. While the guardianship proceedings were continuing, Wilma contacted an estate attorney, Jerry Hyman, Esquire, to whom Wilma was referred by Ms. Seubert.[59] Wilma initially met with Mr. Hyman for two hours on December 15, 2003.[60] At that meeting, Wilma provided Mr. Hyman approximate figures regarding the value of her assets, although she was unable to provide exact information at that time.[61] During the December meeting, Wilma told Mr. Hyman that she wanted to specifically exclude Allan from the will and leave 80% of the residue of her estate to a charity assisting children in Wilmington, Delaware, with Mr. Fender and Mrs. Fender each receiving 10% of the residue of the estate.[62] Shortly after their meeting, Mr. Hyman mailed a draft will to Wilma for her review.

Wilma waited for approximately two months, until the Guardianship Order was signed, before calling Mr. Hyman to discuss the draft will. During two different phone

---

[58] JX 69 ¶¶ 8-9.
[59] See JX 60 (intake form with handwritten note at bottom of the page 1 referencing "referral from Suzanne Seubert … contested guardianship, but seems to have testamentary capacity").
[60] JX 8.
[61] Tr. at 576-77, 588 (Hyman).
[62] JX 58.

calls, one on February 18, 2004 and a second on February 23, 2004, Wilma and Mr. Hyman spent a total of one hour discussing changes to the draft will.[63] Wilma initiated one if not both of these calls.[64] Among the changes Wilma made to the draft will were adding Mr. and Mrs. Leach as residuary beneficiaries of the estate.[65]

On February 24, 2004, Wilma went to Mr. Hyman's office for the signing ceremony for her new will (the "2004 Will"). In its final form, the will gave a 10% interest in the residue of Wilma's estate to each of the Fenders and each of the Leaches, with the remaining 60% going to Child, Inc., a charitable organization in Wilmington, Delaware.[66] The 2004 Will also expressly left nothing to Allan, Karen, or the four Kittila children.[67]

Mr. Hyman was aware of the Guardianship Order, but he did not talk to the Leaches before the 2004 Will was signed and the Leaches were unaware of the will until after it was executed.[68] None of the beneficiaries of the 2004 Will were present during the signing, and Mr. Hyman conducted his standard "signing ceremony" with Wilma during which he asked her to identify the document she was signing, explain her intentions, and state whether she was signing of her own free will.[69] During his meetings and phone calls with Wilma, and at the signing ceremony, Mr. Hyman concluded that Wilma had testamentary capacity because she was capable of exercising thought,

---

[63] JX 8.

[64] *Id.*

[65] JX 65.

[66] *Id.* Article Third.

[67] *Id.*

[68] Tr. at 586-87 (Hyman); Pre-Tr. Order ¶ (II)23.

[69] Tr. at 566-67.

reflection, and judgment, understood the nature of her property, and comprehended the effect of her actions.[70]

### E. Wilma Moves to Millcroft

Although the terms of the Guardianship Order required the Leaches to update the Kittilas regarding material changes in Wilma's status, and indicated that the Leaches would convey messages from the Kittilas, the Leaches had almost no contact with the Kittilas after the Guardianship Order was signed and the Kittilas never saw Wilma again until a chance meeting in a hospice facility shortly before she died. Mr. Leach testified that, although he understood the terms of the Guardianship Order, he strove to balance those terms with Wilma's interests and the likelihood she would be upset by contact from the Kittilas or information about her being provided to the Kittilas.[71]

After Wilma began to calm down from the stress and anger she felt over the guardianship proceedings, Wilma and the Leaches settled into a routine where the Leaches would check on Wilma every couple of weeks.[72] Mr. Leach handled most of the financial aspects of the guardianship, and would spend significant time preparing accountings, annual updates, and necessary petitions.[73] Mr. Leach got into the habit of preparing initial drafts of these papers, before involving counsel, to minimize costs and preserve Wilma's assets.[74] Mr. Leach provided Wilma a copy of the annual accounting

---

[70] Tr. at 574-75 (Hyman).
[71] *Id.* at 474-75, 477 (M. Leach).
[72] *Id.* at 491-92 (M. Leach).
[73] *Id.* at 488-90 (M. Leach).
[74] *Id.* at 489-90 (M. Leach).

each year, and she would discuss with him – on a high level – the accounting and her financial position.[75]

The Leaches began discussing with Wilma a plan to move her out of her Hockessin home, but Wilma was very independent and valued her freedom, and the guardians therefore spent considerable time assisting Wilma with making her own decisions rather than imposing a decision upon her.[76] Wilma and Mrs. Leach toured a number of senior living facilities before Wilma ultimately selected Millcroft Senior Living in Newark, Delaware ("Millcroft"). Wilma chose a two-bedroom apartment in Millcroft's independent living section. To qualify for independent living at that time, prospective residents of the facility would have been required to present a physican's report indicating they were able to perform most activities of daily living independently, including dressing, bathing, caring for their apartment, getting to meals, and the like.[77]

Wilma moved to Millcroft in January 2005 and remained in the independent living section until May 2012.[78] The move and the associated sale of her home and some of her personal belongings was a time-consuming process for Wilma and her guardians, particularly because she had lived in the home for 50 years and amassed a large collection of personal items.[79] Although Wilma had difficulty adjusting to Millcroft in the first few weeks after her move, she eventually organized her apartment and settled

---

[75] *Id.* at 510-11 (M. Leach).
[76] *Id.* at 492-93 (M. Leach).
[77] *Id.* at 548-49 (Denney).
[78] *Id.* at 552 (Denney).
[79] *Id.* at 496-98 (M. Leach).

into a routine, after which the Leaches only visited her once or twice a month.[80] Wilma continued to drive herself to appointments, went shopping, played bingo, and attended dinner in the Millcroft dining room every night, where she routinely socialized with the other residents.[81] Wilma enjoyed clipping coupons and considered shopping for a bargain an "adventure."[82] Her main difficulties arose when she would misplace something and ask the guardians to help her find it, which became a relatively common occurrence in her life.[83]

Although the Kittilas believed that the guardianship would ensure Mr. Fender would be "out of the picture," in fact Mr. and Mrs. Fender continued to socialize with Wilma,[84] including visiting Wilma at Millcroft and inviting her to holidays and social gatherings at their home.[85] Wilma continued to speak highly of Mr. Fender, describing him as the "greatest thing around."[86]

### F. The 2009 Will

In 2008, during a visit to Wilma's apartment to help her search for a missing item, Mr. Leach came across a copy of the 2004 Will.[87] This was the first time Mr. Leach saw the will and he was "disappointed" that Wilma had named him and his wife as beneficiaries because he had asked her not to do so.[88] Mr. Leach also believed Mr.

---

[80] *Id.* at 499, 501 (M. Leach).
[81] *Id.* at 429-30 (C. Leach), 501 (M. Leach), 553-55 (Denney).
[82] *Id.* at 553-54 (Denney).
[83] *Id.* at 500-01 (M. Leach).
[84] *Id.* at 414-15 (C. Leach).
[85] *Id.* at 335-37 (J. Fender).
[86] *Id.* at 434-35 (M. Leach).
[87] *Id.* at 502-03 (M. Leach).
[88] *Id.* at 503 (M. Leach).

Fender was not the best choice as executor, both because that was not Mr. Fender's "skill set" and because Mr. Leach felt his knowledge of Wilma's assets would allow him to administer the estate without incurring substantial costs that might be necessary if someone unfamiliar with her assets was appointed executor.[89]

Mr. Leach therefore wrote Wilma a letter – a practice he used when he wanted to emphasize to Wilma the importance of a topic – suggesting she consider appointing him as executor of her estate because of the potential cost savings.[90]  After Wilma agreed with that idea, Mr. Leach retyped her 2004 Will, changing only the names of the executors, and gave the revised draft to Wilma.  Wilma approached him to discuss the will and possible beneficiary changes, at which point Mr. Leach suggested she discuss the matter with Mrs. Leach.[91]  Wilma and Mrs. Leach discussed Wilma's estate plan for "a while," a meeting that lasted longer than typical meetings with Wilma.[92]  During this meeting, Wilma and Mrs. Leach discussed the beneficiaries named in the draft will.  Wilma asked Mrs. Leach whether she had knowledge of "any charities that benefited women and children."  Mrs. Leach mentioned two: the YWCA and the Kennett Education Foundation, which were two charities of which Mrs. Leach had personal knowledge.[93]  At the time, Mrs. Leach was the treasurer of the Kennett Education Foundation.[94]  Mrs. Leach also researched the charity named in Wilma's 2004 Will, Child, Inc., and told

---

[89] *Id.* at 503-04 (M. Leach).
[90] JX 90.
[91] Tr. at 460 (M. Leach).
[92] *Id.* at 459-60 (M. Leach).
[93] *Id.* at 417-18 (C. Leach).
[94] *Id.* at 419 (C. Leach).

19

Wilma it was "a very good charity that benefited women and children."[95] During this discussion, Wilma also mentioned wanting to increase the percentage of the estate she left to Mr. and Mrs. Leach, explaining that they had been her guardians for 5 years and she wanted to do something for them.[96]

After Wilma and Mrs. Leach finished their meeting, Mr. Leach made the additional revisions to the draft will and contacted Edmund Lynch, Esquire, who previously represented the Leaches in an estate matter.[97] Mr. Lynch agreed to assist Wilma, but inquired about her capacity when he learned about the Guardianship Order.[98] Mr. Leach invited Ms. Seubert to comment on Wilma's capacity, and Ms. Seubert responded by e-mail that "Wilma is NOT incompetent, and although I have not talked with her in almost a year, I suspect she is (sic) has plenty of vinegar left."[99]

Mr. Lynch met with Wilma only once, for approximately 30 minutes, when she came to his office on February 17, 2009 to sign her revised will (the "2009 Will").[100] He reviewed with her the terms of the revised will and Wilma answered all of Mr. Lynch's questions to the point he concluded she had a sense of who her family was and the assets that belonged to her, and that she was acting out of her own free will.[101] Neither the Leaches nor the Fenders were present for the signing of the 2009 Will, which was

---

[95] *Id.* at 418 (C. Leach).
[96] *Id.* at 424 (C. Leach).
[97] *Id.* at 438 (Lynch).
[98] *See* JX 92.
[99] *Id.*
[100] Tr. at 439 (Lynch).
[101] *Id.* at 442-43 (Lynch).

witnessed by Ms. Seubert and another individual.[102] The 2009 Will left 15% of the residue of Wilma's estate to each of the Leaches and each of the Fenders, with the remaining 40% divided between three charities: Child, Inc. (15%), YWCA, Inc. of Wilmington, Delaware (15%), and the Kennett Education Foundation (10%).[103] As with the 2004 Will, the 2009 Will expressly made no provision for Allan, Karen, and their children.

## G. Wilma's Decline and Passing

According to the Leaches and to Mary Denney, a Millcroft employee who spoke to and observed Wilma on a regular basis, Wilma did not exhibit substantial deficits in her mental capacity until early to mid-2011.[104] At that time, her failing eyesight aroused concerns for the Leaches regarding her driving capabilities, and her license ultimately was revoked when she could not pass a driving test.[105] Other evidence indicates that Wilma was able to manage her affairs with relative autonomy through 2010. For example, records from 2008 through September 2010 from Wilma's primary care physician, Dr. James Salva, routinely describe Wilma as alert, oriented, cooperative, and exhibiting normal judgment and with appropriate mood and affect.[106] The testimony is undisputed that until 2011 she managed well in Millcroft's independent living section, was able to drive herself to appointments and social events, shopped for her needs, and engaged in social conversations with the residents and staff at Millcroft. Although

---

[102] JX 93.

[103] *Id.*, Article THIRD.

[104] Tr. at 428-30 (C. Leach), 481-84 (M. Leach), 557 (Denney).

[105] *Id.* at 429-30 (C. Leach), 481 (M. Leach).

[106] *See* JX 7 at P002066, 2068, 2073-74, 2093, 2095, 2101, 2017, 2121, 2123.

Wilma was not an overly social person, she was not isolated, aside from what appears to have been a life-long interest in maintaining her privacy. Despite the guardianship, Wilma largely maintained the independence she valued, relying on the guardians primarily to oversee her finances and help her locate her (frequently) misplaced possessions.

By early to mid-2011, however, the Leaches agree that Wilma's physical capabilities and her mental acuity were declining. She began accusing "the man" of stealing things from her apartment, had difficulty driving, was having trouble managing her medications, and exhibited poor judgment.[107] For example, on one occasion Wilma used her oven to try to heat her apartment. Wilma also was not able personally to manage housekeeping tasks, but her paranoia about possible thefts left her unwilling to accept assistance from hired help. In fall 2011, the Leaches retained a company called Decisions4Life, which evaluated Wilma and made a series of recommendations. Decisions4Life recommended that Wilma move to an assisted living facility where she could be more closely monitored and receive assistance with the activities of daily living she no longer could perform for herself.[108] The Leaches agreed with that recommendation, but Wilma's resistance to moving to an assisted living facility, which Wilma called "death row," was an evident and significant hurdle.[109]

In May 2012, Wilma was hospitalized and never returned to Millcroft, but instead was placed in hospice, followed by a stay in a dementia unit at an assisted living facility,

---

[107] JX 21; Tr. at 483-84 (M. Leach).
[108] JX 101.
[109] *See* Tr. at 508 (M. Leach).

followed by another hospitalization, rehabilitation, and a final stay in hospice, where she passed away on October 19, 2012.[110] Wilma's cause of death is listed as Alzheimer's dementia on her death certificate.[111]

In the final months of her life, Wilma coincidentally resided for a time in the same hospice unit where Allan Kittila was placed at the end of his life. Sadly, Allan had bone marrow disease, which turned into acute leukemia, and he died on August 23, 2012, less than two months before Wilma died.[112] Although Mr. Leach learned by happenstance that Allan and Wilma were staying in the same hospice unit, he did not share that information with the Kittilas, even when Karen called the Leaches to inform them that Allan was near death.[113] Karen, however, discovered that Wilma was in the same hospice unit less than an hour after Allan died.[114] Karen sought and received permission from the guardians to visit Wilma that day. Wilma did not recognize Karen, so their exchange was brief but cordial.[115] The Kittilas never saw Wilma again and did not learn of her death until her obituary appeared in the newspaper ten days later.

## H. The Guardianship Before and After Wilma's Death

The Kittilas feel that Mr. and Mrs. Leach did not live up to either the spirit or the terms of the Guardianship Order, and that belief is not without foundation, although most of the decisions the Leaches made were reasonable under the circumstances they faced.

---

[110] *Id.* at 508-09 (M. Leach).
[111] Pre-Tr. Order ¶ II(32).
[112] Tr. at 121-24 (Karen).
[113] *Id.* at 121 (Karen).
[114] *Id.* at 122-23 (Karen).
[115] *Id.* at 123-24 (Karen).

First, the petitioners point out that the Leaches did not provide anything more than cursory updates regarding Wilma throughout the guardianship, and even then usually did so only when prompted by inquiries from the Kittilas. I believe this is true, but I also recognize that Mr. and Mrs. Leach undertook their position as guardians to assist Wilma and were forced to balance the terms of the Guardianship Order with Wilma's strong antipathy toward the Kittilas and the likelihood that she would become upset if she learned that information was being passed to the Kittilas. In addition, the Kittilas never sought to enforce the terms of the guardianship order during Wilma's lifetime.

More significant is the Kittilas' justified anger that Mr. and Mrs. Leach did not (1) inform them of Wilma's ill health at the end of her life, (2) notify the Kittilas that Wilma was residing in the same hospice unit as Allan, or (3) notify the Kittilas when Wilma passed away. Given Wilma's advancing dementia, I am doubtful that she would have been upset – or even known – that information was provided to the Kittilas in the final months of her life, and there is no justifiable excuse for the failure to inform the Kittilas of Wilma's death. The Leaches are bright people who are not inexperienced with estate matters, and I believe that they knew the Kittilas might challenge Wilma's will and did not relish that fight, particularly given Mr. Leach's position as executor. Ironically, the Leaches' decision to withhold information probably fed the Kittilas' concerns about undue influence and increased the likelihood for litigation. In any event, although I do not approve of the guardians' decision not to be forthcoming, particularly after Wilma's death, I do not believe their actions are indicative – in this case – of undue influence.

The Kittilas' other criticism of the guardians bears mention. Although the Kittilas believed that the Leaches would address the family's concerns regarding Mr. Fender's influence on Wilma's life, the Kittilas were not aware that the Fenders and the Leaches were friends and did not know that both Mr. and Mrs. Fender continued to socialize with Wilma after the Guardianship Order was entered. The friendship between the couples deepened after both Mrs. Leach and Mrs. Fender retired from their respective jobs. The couples have traveled together to Egypt and St. John, and the Kittilas strongly imply that the Leaches' friendship with the Fenders left them unable to protect Wilma from Mr. Fender's influence on her life.

Although it is not a focus of either party's arguments, it bears mention that Mr. and Mrs. Leach served as Wilma's guardians for almost a decade without seeking any commission for their service. Under this Court's rules, the guardians were entitled to petition for an annual commission based on Wilma's income and assets. Mr. and Mrs. Leach chose not to request any such compensation, even in the years when the guardianship required a significant outlay of time, such as the years when Wilma moved and sold her home and the last year of her life, when significant health issues required additional attention.[116]

## I. Procedural History

The Kittilas learned of Wilma's death when her obituary was printed in the paper. Ted promptly called Mr. Leach. Mr. Leach told Ted, falsely, that Karen had been notified of Wilma's passing. Mr. Leach also gave evasive answers when Ted inquired

---

[116] Tr. at 424 (C. Fender).

25

about Wilma's will; Mr. Leach stated that he did not know whether he was named in the will and implied that Wilma's estate was small because her resources had been exhausted.[117] In fact, Mr. Leach knew he was named in the 2009 Will because he assisted Wilma with revising the will, and as her guardian he certainly knew the extent of her estate, which contained approximately $450,000 at the time Wilma died.

On November 9, 2012, Karen and Chris filed a petition contesting Wilma's 2009 Will. Mr. Leach, as executor of Wilma's estate, moved to dismiss the petition on the basis that it failed to state a claim on which relief could be granted. I issued a bench report recommending that the Court deny the motion to dismiss, and Karen and Chris filed an amended petition on April 17, 2013 challenging both the 2009 Will and the 2004 Will. Trial was held over three days beginning April 30, 2014. After the parties submitted post-trial briefing and engaged in post-trial argument, I took the case under advisement.

## J. The Parties' Trial Experts

Both parties introduced at trial competing expert reports regarding Wilma's mental capacity at the time she executed the disputed wills. The petitioners relied on the expert report and testimony of Dr. Tavani, while Mr. Leach – as executor – introduced the expert report and testimony of Dr. Rovner. The parties' experts disagree regarding the severity of Wilma's mental deficits in 2003 – when each of the doctors examined her – and the extent those deficits affected her capacity to execute the disputed wills.

---

[117] *Id.* at 50-53 (Ted).

Dr. Tavani is a psychiatrist with a distinguished professional history. She presently is in private practice as the director of Christiana Psychiatric Services, providing hospital consultation and outpatient counseling in Delaware. Dr. Tavani also provides psychiatric consulting services in a drug and alcohol treatment facility, serves as an expert witness in a variety of matters, and teaches at a number of institutions in Delaware and Pennsylvania.

Dr. Tavani did not see Wilma again after she performed the independent medical examination and issued her initial report in connection with the guardianship proceedings. When called upon to serve as an expert in this matter, Dr. Tavani reviewed Wilma's medical records along with some of the discovery exchanged in this case.[118] Dr. Tavani's 2014 report reviewed the findings of her 2003 report, including her opinion that Wilma "clearly demonstrated neurocognitive deficits consistent with dementia presumably of the Alzheimber's type, with delusions, and also deficiencies in executive function, and with depressed mood." To update and test that conclusion, Dr. Tavani reviewed all of the available medical records for Wilma beginning in approximately 2000, including the 2003 report issued by Dr. Rovner, noting each occasion in which Wilma was described as having memory lapses, depression, aggressive or angry affect, or paranoia.[119] Dr. Tavani discounts as "boilerplate EMR verbiage" Dr. Salva's records describing Wilma as being oriented and having normal judgment.[120] Dr. Tavani also criticizes Dr. Rovner's 2003 expert report as relying only on Wilma's self-reporting of

[118] JX 119 at 5-6.
[119] *Id.* at 6-18.
[120] *Id.* at 15.

her own abilities.[121]  Based on her review of the record, Dr. Tavani concludes in her 2014 report that Wilma had dementia, likely Alzheimer's type, because she exhibited memory loss, deficiencies in executive function, and a loss of social cognition.  According to Dr. Tavani, Wilma's dementia was present by 2003, would not have improved, and as a result she lacked testamentary capacity and was susceptible to undue influence when she executed the challenged wills.[122]

In contrast, Dr. Rovner opined that Wilma possessed testamentary capacity at the time she executed the disputed wills.  Dr. Rovner – like Dr. Tavani – has an impressive professional history.  He currently serves as a tenured professor in the Department of Psychiatry and Human Behavior at the Jefferson Medical College of Thomas Jefferson University, as the Director of the Alzheimer's Disease and Dementia Center at Thomas Jefferson Hospital, and the Director of the Division of Geriatric Psychiatry at Jefferson Medical College.  Dr. Rovner reviewed his 2003 examination of Wilma, along with the depositions and medical records obtained through discovery in this action and the guardianship action, and disagreed with Dr. Tavani's conclusions regarding Wilma's capacity and susceptibility.  According to Dr. Rovner, Dr. Tavani reached her conclusions without objective evidence and without formally assessing Wilma's decision-making abilities or independently evaluating whether Wilma was suffering from delusions.[123]  Pointing to Wilma's consistent high scores on the MMSE, the conclusions of APS, an assessment of Wilma conducted at the University of Delaware in 2003, the

---

[121] *Id.* at 7-8.
[122] *Id.* at 18-21.
[123] JX 3 at 4-5.

testimony of Mr. Lynch and Mr. Hyman, and Wilma's ability to live relatively independently until a year before her death, Dr. Rovner reasons that, although Wilma had dementia in later years, the dementia did not strip her of testamentary capacity at the time she executed the disputed wills, and he contends the evidence shows that she had such capacity and was not susceptible to influence from the Leaches or the Fenders during that period.[124]

## ANALYSIS

Delaware law disfavors invalidating a testamentary plan and this Court therefore presumes that a will is valid, that a testator possessed testamentary capacity at the time she executed a will, and that the will was not the product of undue influence.[125] For that reason, the party challenging a will ordinarily bears the burden of proof by a preponderance of the evidence.[126] Proof by a preponderance of the evidence "means that certain evidence, when compared to the evidence opposed to it, has the more convincing force and makes you believe that something is more likely true than not."[127]

### I.    Wilma had testamentary capacity at the time she executed the 2009 Will.

The Delaware Supreme Court has explained that a person who makes a will must "be capable of exercising thought, reflection and judgment, and must know what he or

---

[124] *Id.* at 4, 6.
[125] *In re Estate of West*, 522 A.2d 1256, 1263, 1265 (Del. 1987).
[126] *Id.* at 1263; *In re Estate of Justison*, 2005 WL 217035, at *6-7 (Del. Ch. Jan. 24, 2005).
[127] *Mitchell Lane Publishers, Inc. v. Rasemas*, 2014 WL 4925150, at *3 (Del. Ch. Sept. 30, 2014) (quoting *Triton Constr. Co. v. E. Shore Elec. Servs., Inc.*, 2009 WL 1387115, at *6 (Del. Ch. May 18, 2009)).

she is doing and how he or she is disposing of his or her property."[128]  In addition, a testator must "possess sufficient memory and understanding to comprehend the nature and character of the act."[129]  In other words, a testator must know that he is disposing of his estate by will and to whom.[130]  Testamentary capacity is measured at the time a will is executed.[131]

The petitioners argue that Wilma lacked testamentary capacity at the time the Guardianship Order was signed, and that the nature of her impairments were such that she would not have regained capacity after that time.  In making this argument, the petitioners rely primarily upon their own observations of Wilma before the guardianship petition was filed, Dr. Tavani's diagnosis, and the fact that Wilma's explanations of her decision to remove the Kittilas from the 2004 Will did not comport with reality.  The estate, on the other hand, points to the opinion of Dr. Rovner and the observations of Wilma's primary care physician, attorneys, and friends.

Only a modest level of competence is required to meet the standard for testamentary capacity in Delaware.[132]  Although the petitioners have offered some evidence to the contrary, I conclude that they have not shown by a preponderance of the evidence that Wilma – at the time she executed the 2009 Will – did not know she was disposing of her property by will and to whom.  I reach that conclusion for two reasons.

---

[128] *In re Estate of West*, 522 A.2d at 1263; *see also In re Estate of Justison*, 2005 WL 217035, at *7.
[129] *In re Estate of West*, 522 A.2d at 1263.
[130] *Id.*; *Sloan v. Segal*, 2009 WL 1204494, at *14 (Del. Ch. Apr. 24, 2009).
[131] *Sloan*, 2009 WL 1204494, at *14.
[132] *In re Estate of West*, 522 A.2d at 1263.

First, the evidence on which the petitioners rely does not, in my view, make it more likely than not that Wilma lacked capacity in 2009. Second, the observations of several people – including a number of disinterested witnesses – show that Wilma met the level of competence required to execute a will in Delaware.

First, I credit the Kittilas' testimony that Wilma was experiencing memory problems by 2003 and that other stressors in her life had left her unsettled and – at times – angry without apparent provocation. Wilma's medical records indicate that she exhibited similar symptoms after knee surgery and with Dr. DeSai. Wilma also appeared somewhat disoriented in Dr. Tavani's office. That evidence, however, does not satisfy the petitioners' burden, particularly when all those observations were made five or six years before the 2009 Will was executed and are inconsistent with more recent evidence.

Dr. Tavani opines that Wilma had dementia and that the progressive nature of the disease is such that Wilma would not have regained capacity after 2003. It is undisputed that Alzheimer's dementia is a progressive and debilitating disease for which modern medicine has found no cure. The nature of the disease typically is one of a steady decline, possibly with plateaus, and in which a person may have periods of lucidity followed by periods of confusions and disorientation.[133] Significantly, however, a diagnosis of dementia, including Alzheimer's dementia, is not conclusive of a person's testamentary capacity. Rather, this Court repeatedly has recognized that a person diagnosed with Alzheimer's dementia may nevertheless possess testamentary capacity at

---

[133] JX 119 at 20-21.

31

the time a will is executed.[134] Rather than placing conclusive weight on the diagnosis of medical professionals, this Court gives considerable attention to the testator's behavior and condition at or near the time the will was executed.[135]

In reaching her conclusions about Wilma's capacity, however, Dr. Tavani placed almost exclusive weight on the impressions of people who met with Wilma between 2000 and 2003, while discounting more recent evidence, most of which is inconsistent with her opinion. For example, Dr. Tavani concluded Wilma had difficulties with executive function and social cognition, but did not address the observations of Wilma's attorneys and friends and gave no weight to the neuropsychological testing conducted by Dr. Rovner's associate – which appears to be the only objective medical evidence testing Wilma's executive function. Dr. Tavani also gives short shrift to Dr. Salva's records, which are contemporaneous with Wilma's execution of the 2009 Will, concluding without explanation that the indications that Wilma was oriented and exhibited normal judgment must have been standard entries filled in by electronic medical record software, rather than the result of Dr. Salva's evaluation of Wilma. Although Dr. Tavani's dementia diagnosis may well be accurate, her conclusions regarding testamentary capacity are not persuasive when weighed against the other record evidence, in part because she does not seem to consider that evidence.

---

[134] *Sloan*, 2009 WL 1204494, at *15; *In re Estate of Justison*, 2005 WL 217035, at *8-9 (Del. Ch. Jan. 24, 2005); *Scholl v. Murphy*, 2002 WL 927381, at *2 (Del. Ch. Apr. 17, 2002) (Master's Report).
[135] *In re Estate of Justison*, 2005 WL 217035, at *9; *Scholl*, 2002 WL 927381, at *2-3.

In addition, Dr. Tavani and Dr. DeSai both appeared to conclude that Wilma was suffering from delusions – namely those regarding Allan – and that those delusions distorted her thinking at the time she executed the disputed wills.[136] Although petitioners do not directly argue the point, it is possible that delusions may affect a testator's capacity to the point that he is not legally capable of making a will, but mere mistake or prejudice do not rise to the level of a "delusion."[137] Although the record shows that Wilma was mistaken in her recollections about the trip to the wolf museum, the toast at Ted's wedding, and the relation between those events, there is no evidence that she clung to those beliefs after being presented with compelling evidence to the contrary, which would be required to elevate Wilma's mis-recollection to a delusion.[138] Wilma also offered other explanations for her falling out with Allan, such as her perception that he only was interested in her possessions, rather than her well-being. However mistaken Wilma's impression may have been, and I suspect it was mistaken, that fact that she misinterpreted Allan's motivations is not enough to conclude she lacked testamentary capacity or that delusions so affected her knowledge, memory, and understanding as to make the challenged wills the result of the delusion.

Importantly, although Wilma indicated an intent to remove the Kittilas from her will before the guardianship was filed, she did not do so until after the guardianship proceeding concluded and did not indicate who the replacement beneficiaries would be

---

[136]*See e.g.*, Pet'rs' Post-Trial Opening Br. at 58.
[137] *See e.g.*, *In re Barnes' Will*, 18 A.2d 433 (Del. Super. 1941); *Rodney v. Burton*, 86 A.2d 826 (Del. Super. 1912).
[138] JX 3 at 5.

until that time. The Kittilas acknowledge the devastating effect the guardianship proceedings had on Wilma's feelings for the family. Therefore, however incorrect Wilma was regarding Allan and the rest of the family before the guardianship proceedings began, I cannot conclude that it was those mistaken beliefs, rather than her anger over the guardianship proceedings, that prompted Wilma to sign the 2009 Will.

In summary, although the absence of an understandable explanation for Wilma's change of heart regarding Allan is frustrating, particularly for the Kittilas, I cannot conclude that it serves as a basis to overturn Wilma's testamentary scheme. This is particularly so given the ample and compelling evidence that Wilma met the standard for capacity at the time she executed the 2009 Will. First, two attorneys – Mr. Lynch and Ms. Seubert – observed Wilma on the day she executed that will. Although Mr. Lynch never had met Wilma before, he did discuss the will with her and had no concerns about her capacity. Ms. Seubert had known Wilma for years and was well positioned to notice any significant decline in her functioning. In addition, Wilma's primary care physician described her as oriented and exhibiting normal judgment between 2008 and 2010, Wilma was able to live independently in that time period, she continued to drive, make appointments, and socialize with the other Millcroft residents, and she had a general sense of the extent and character of her assets, even though she was not independently managing her finances. [139]

---

[139] The fact that Wilma may not have known the exact value of her assets at the time she executed the 2009 Will does not lead me to conclude that she lacked capacity. Rather, Mr. Leach's undisputed testimony, which I found credible, is that Wilma maintained a general sense of her financial assets, asked questions regarding her financial security, and demonstrated

In short, balancing the evidence presented by petitioners against the evidence presented by the Estate, I believe it is more likely than not that Wilma could exercise thought, reflection, and judgment and understand the nature of her actions at the time she executed the 2009 Will. The petitioners argue, however, that the typical presumption of validity and the allocation of the burden to the party objecting to a will should not apply in this case. The Delaware Supreme Court's decision in *In re Will of Melson* instructs that the presumption of validity and the allocation of the burden of proof to the objector do not apply when

> the challenger of the will is able to establish, by clear and convincing evidence, the following elements: (a) the will was executed by 'a testatrix or testator who was of weakened intellect'; (b) the will was drafted by a person in a confidential relationship with the testatrix; and (c) the drafter received a substantial benefit under the will.[140]

If the petitioners can make that showing, the burden shifts to Mr. Leach to prove by a preponderance of the evidence that Wilma possessed testamentary capacity and executed the challenged wills free from undue influence.[141]

It is fair to conclude that Mr. Leach received a substantial benefit from the 2009 Will, at least if the increase in his share of the residue is considered in conjunction with the increase in Mrs. Leach's share, and if the Court assumes that the bequest to the Kennett Education Foundation – on whose board Mrs. Leach served – was a benefit to Mrs. Leach. The petitioners, however, have not shown by clear and convincing evidence

---

concern regarding her finances. *See Scholl v. Murphy*, 2002 WL 927381, at *4 (fact that testator did not know the balance in his bank accounts was not sufficient to show a lack of testamentary intent).

[140] 711 A.2d 783, 788 (Del. 1998).

[141] *Id.*

that Wilma was of weakened intellect at the time she executed the 2009 Will or that Mr. Leach fairly may be characterized as the "drafter" of the 2009 Will.

There is no Delaware case precisely defining the standard for "weakened intellect," although it is clear that the standard is less than that required to show a lack of testamentary capacity.[142] A finding that a testator suffered from a weakened intellect does not require "an advanced degree of debilitation," and may be shown where there was "a sudden change in the testator's living habits and emotional disposition."[143]

If Wilma had executed the challenged will in 2011, when her faculties began to slip noticeably and those around her observed changes in her personality and emotional stability, the petitioners would have a stronger case that Wilma was of weakened intellect. In 2009, however, Wilma was living independently, scheduling and driving herself to appointments, regularly attending evening meals and socializing with other Millcroft residents, and all of the trial witnesses who observed her in this time period described her as lucid and largely self-sufficient. Dr. Salva's records from 2009 are not indicative of someone exhibiting "weakened intellect." Although her guardians managed her finances, and she misplaced personal items not infrequently and required the guardians' assistance to find them, Wilma's dementia apparently had not progressed to the point that she required substantial daily assistance. In addition, the undisputed testimony showed that she remained opinionated and strong-willed and could not easily be swayed, even by her guardians.

---

[142] *Sloan v. Segal*, 2009 WL 1204494, at *13.
[143] *Id.*

Although that conclusion is dispositive of the question of whether the petitioners can meet the *Melson* test, I also do not believe that Mr. Leach fairly may be described as the "drafter" of the 2009 Will. Mr. Leach did prompt Wilma to review her 2004 Will, and he did transcribe the 2004 Will into electronic form and make some changes to the Will. The only change Mr. Leach initiated, however, was naming himself as executor, which he reasonably concluded could save Wilma's estate money given his familiarity with Wilma's finances. Any other changes were those Wilma chose to make after she reviewed the will. Mr. Leach then input those changes into the electronic copy of the 2009 Will and forwarded that to an attorney, after which Mr. Leach removed himself from the process. Although Mr. Leach may fairly be described as a "scribe" for purposes of the 2009 Will, I do not believe the petitioners have shown by clear and convincing evidence that he "drafted" the Will, at least as that term was used by the Supreme Court in *Melson*.

In *Melson* and in other cases in which this Court has shifted the burden of proof under the *Melson* test, the will in question was drafted by a layperson, without the input of an attorney and without the testator consulting counsel.[144] In contrast, Mr. Leach transcribed an earlier will that was the product of Wilma's extensive consultation with

---

[144] *See In re Will of Melson*, 711 A.2d at 785 (substantial beneficiary of will used software package to draft a will for his hospitalized mother, who signed the will without consulting an attorney and in the presence of witnesses who did not hear the testatrix speak and who never had met her before); *Sloan*, 2009 WL 1204494, at *15 (substantial beneficiary of challenged codicil drafted codicil and presented it to testatrix, who signed it without consulting counsel and while residing in a locked wing of a dementia unit); *In re Will of Wiltbank*, 2005 WL 2810725 (Del. Ch. Oct. 18, 2005) (beneficiary drafted will using computer program and then drove testator to bank to have the will notarized and witnessed); *In re Estate of Hafer*, 2000 WL 1721129 (Del Ch. Oct. 25, 2000) (will was drafted by the son of the primary beneficiary and without the testator consulting counsel before executing the will).

her attorney, Mr. Hyman. Two other attorneys, Mr. Lynch and Ms. Seubert, were present when Wilma signed the 2009 Will, at which time she confirmed that she understood its contents. Taking a pragmatic view of the *Melson* test, I do not believe that the factors animating that court's decision to shift the burden of proof apply in these circumstances. Mr. Leach followed his common practice of saving money by preparing a draft of a legal document for Wilma, but then passed the draft to an attorney who reviewed the document, met with Wilma, and watched her execute the document in the presence of her long-time attorney. Even if Mr. Leach "drafted" the will under *Melson*, however, I do not believe the burden of proof should shift because Wilma was not suffering from weakened intellect.

## II. The 2009 Will was not the product of undue influence.

The petitioners also contend that the challenged wills were the product of undue influence, arguing that the Leaches unduly influenced Wilma to make the 2009 Will and that the Fenders unduly influenced her to make the 2004 Will. Under Delaware law, undue influence is

> an excessive or inordinate influence considering the circumstances of the particular case. The degree of influence to be exerted over the mind of the testator, in order to be regarded as undue, must be such as to subjugate his mind to the will of another, to overcome his free agency and independent volition, and to compel him to make a will that speaks the mind of another and not his own. It is immaterial how this is done, whether by solicitation, importunity, flattery, putting in fear or some other manner. Whatever the means employed, however, the undue influence must have been in

38

operation upon the mind of the testator at the time of the execution of the will.[145]

A party challenging a will must prove the five elements of undue influence by a preponderance of the evidence. Those elements are: "(1) a susceptible testator; (2) the opportunity to exert influence; (3) a disposition to do so for an improper purpose; (4) the actual exertion of such influence; and, (5) a result demonstrating its effect."[146]

Although the petitioners can demonstrate (1) that the guardians had the opportunity to exert influence over Wilma, given their position of authority in her life, and (2) assuming an exertion of influence, a result demonstrating its effect, the petitioners have failed to prove the remaining three elements of the claim. First, the evidence does not, in my view, support a finding that it is more likely than not that Wilma was a susceptible testator at the time she executed the 2009 Will. Inquiry into susceptibility is similar to considerations of capacity, although susceptibility is a lower threshold.[147] A finding of susceptibility often is equivalent to a finding that a testator suffered from weakened intellect under the *Melson* test.[148] Conversely, having concluded that Wilma did not have weakened intellect when she executed the 2009 Will, I conclude that she was not a susceptible testator for largely the same reasons. Rather that regurgitate that reasoning, I note a couple of key facts supporting my conclusion. First, although the petitioners argue otherwise, Wilma was not socially isolated when she signed the 2009

---

[145] *In re Estate of West*, 522 A.2d 1256, 1264 (Del. 1987) (quoting *In re Will of Langmeier*, 466 A.2d 386, 403 (Del. Ch. 1983)).

[146] *In re Estate of West*, 522 A.2d at 1264; *In re Will of Cauffiel*, 2009 WL 5247495, at *7 (Del. Ch. Dec. 31, 2009); *In re Will of Langmeier*, 466 A.2d at 403.

[147] *In re Will of Cauffiel*, 2009 WL 5247495, at *7.

[148] *Sloan v. Segal*, 2009 WL 1204494, at *16; *In re Estate of Hafer*, 2000 WL 1721129 at *3.

Will.[149]  She was living in an apartment complex with many other seniors, regularly attended dinners and socialized with those residents, and had her own car and could drive herself places.  Likewise, although Wilma relied on the guardians to assist her with her finances and help her locate lost items, she was not dependent on them in her day-to-day life, and continued to shop for herself, make and drive to her own appointments, and otherwise self-preserve.[150]

The petitioners also have not shown that the Leaches had a disposition to influence Wilma.  Although it is undisputed that Mr. Leach suggested Wilma revise her will to name him as executor and referred her to a family attorney to finalize the will, I do not find those actions indicative of a disposition to exert influence over Wilma.  The Leaches' other conduct also is not consistent with someone disposed to exert influence over another.  For example, in connection with the 2009 Will, the Leaches made sure Wilma's longtime attorney, Ms. Seubert, was involved in the discussion.  The petitioners also have not shown that the Leaches had any particular motive to influence Wilma, other than a general pecuniary motive that could apply to any beneficiary of a will.  If that pecuniary motive were a particular factor for the Leaches, however, one would have

---

[149] In support of this contention, petitioners cite the Decisions4Life report dated December 5, 2011.  The report, issued more than two years after Wilma executed the 2009 Will, was made at a time when Wilma's dementia was impacting her daily life, she had withdrawn socially, and her driving privileges had been revoked.

[150] *Compare In re Will of Cauffiel*, 2009 WL 5247495 (decedent was physically weakened, frail, and dependent on third parties for her day to day care and therefore was a susceptible testator).

expected them to seek a commission during the course of their service as Wilma's guardians. The Leaches, however, never sought any payment in that regard.[151]

Finally, the petitioners have not shown that the Leaches actually exerted influence over Wilma regarding her will. Even if the petitioners had shown that the Leaches had a motive to influence Wilma, the actual exertion of influence cannot be inferred from motive and opportunity.[152] At best, the possibility Wilma was unduly influenced is no more than one of two equally plausible explanations, which is not sufficient to show actual influence under Delaware law.[153] Having reviewed the evidence, I find it more likely that Wilma chose to increase the portion of the estate bequeathed to the Leaches out of gratitude for their service as her guardians. I found the Leaches' testimony credible on the issue of whether they influenced any changes to Wilma's will other than naming Mr. Leach as executor. In addition, the fact that Wilma met with two attorneys, outside the presence of the Leaches, before she signed the 2009 Will lessens the likelihood that she signed the will under inappropriate influence. The view of those attorneys that she was not unduly influenced is entitled to considerable weight by this Court.[154]

---

[151] By saying this, I am not suggesting that guardians who seek a commission are benefiting improperly from their fiduciary position, but simply pointing out the Leaches' conscious decision not to take any money from Wilma during her lifetime.

[152] *In re Estate of West*, 522 A.2d 1256, 1264-65 (Del. 1987); *In re Will of Cauffiel*, 2009 WL 5247495, at *8.

[153] *In re Estate of West*, 522 A.2d at 1265; *In re Estate of Justison*, 2005 WL 217035, at *9 (Del. Ch. Jan. 24, 2005) (If the record offers two equally plausible explanations for a change of beneficiary, one of which does not involve undue influence, the burden of proof has not been met).

[154] *In re Will of Cauffiel*, 2009 WL 5247495, at *9.

### III.    The Guardianship Order did not deprive Wilma of the legal capacity to make a will.

The petitioners also argue that, regardless of issues of testamentary capacity or undue influence, Wilma lacked legal capacity to make a will because the Guardianship Order deprived her of that right.    The petitioners contend that paragraph 2 of the Guardianship Order, which stated that Wilma retained "the right to legal representation and the right to participate in making decisions which affect her life and property with the final decision being reserved to the guardians," precluded Wilma from executing a will without the knowledge and consent of her guardians.    The petitioners assert that this incapacity invalidates both the 2004 Will, of which the guardians had no knowledge until after it was signed, and the 2009 Will, which the guardians did not witness or ratify at the time it was signed.

In support of their argument, the petitioners point to this Court's decision in *In re Will of Langmeier*, in which this Court invalidated the will of an elderly woman over whom a guardianship was imposed two weeks before she executed the challenged will. Among other things, the Court expressed surprise and dismay that the will was executed shortly after the guardianship order was entered and without notice to either the guardian or its counsel.[155]  Nothing in the *Langmeier* decision, however, either states or suggests that a guardianship order deprives a ward of the legal right to make a will.  Rather, the Court in *Langmeier* invalidated the will on the basis of lack of testamentary capacity and undue influence.

---

[155] 466 A.2d 386, 395 (Del. Ch. 1983).

In fairness, however, the petitioners do not appear to argue that a guardianship order always deprives a ward of the power to make a will, but rather that the Guardianship Order over Wilma was distinct because of the addition of paragraph 2. The question, therefore, is whether paragraph 2 can be read as stripping Wilma of the right to make a will. I conclude it cannot because a fair reading of the guardianship statute indicates that this Court – and by extension, Court-appointed guardians – may not make a will on behalf of a disabled person. Specifically, 12 *Del. C.* § 3901(e) provides that, once the Court determines that an individual is disabled within the meaning of Section 3901, the Court "shall have the same powers of control over the estate of the person with a disability which the person with a disability could exercise, if not incapacitated, *except the power to make a will.*"[156] The Court may tailor any guardianship order by giving a guardian more limited powers than those enjoyed by the Court, or may expand a guardian's power to some degree, but any power so granted must be a power "which the Court itself could exercise under [Section] 3901."[157] In other words, the Court does not have the power to make a will on behalf of a disabled person and therefore could not have conferred that power on the Leaches. Whatever the import of paragraph 2 of the Guardianship Order, it did not grant the Leaches "final say" regarding Wilma's will, because Delaware law expressly excludes that power from the powers the Court may extend to guardians. Because of this statutory language, I do not believe that paragraph 2

---

[156] 12 *Del. C.* § 3901(e) (emphasis added).
[157] 12 *Del. C.* § 3923(a).

of the Guardianship Order can be read in a manner that eliminated Wilma's right to make a will.

**CONCLUSION**

This is a difficult case, tried and presented by able counsel who did an admirable job marshalling the evidence. Regardless of my conclusions, I do not believe the Kittilas pursued this case for financial reasons. Rather, I believe they did so – at least in part – in an effort to put right their memories and perception of the relationship they lost with their beloved aunt. Ultimately, however, the evidence is not sufficient to allow this Court to overturn the 2009 Will. Because I conclude that the petitioners have not met their burden to invalidate the 2009 Will, I need not consider the validity of the 2004 Will.[158] For the foregoing reasons, I recommend that the Court enter judgment in favor of the estate and against petitioners. This is my final report and exceptions may be taken in accordance with Rule 144.

/s/ *Abigail M. LeGrow*
Master in Chancery

---

[158] At oral argument the petitioners asserted that the 2009 Will was based on and therefore tainted by the 2004 Will, and that the Court therefore must independently determine the validity of the 2004 Will. I disagree. First, by concluding that Wilma possessed testamentary capacity at the time she executed the 2009 Will, I implicitly have determined that Wilma also possessed capacity at the time she executed the 2004 Will, since the petitioners' argument regarding her capacity is based on the same analysis of her mental state, namely the opinions of Dr. Tavani and Dr. DeSai and Wilma's purported delusions regarding Allan, Karen, and their children. Second, even if the petitioners could prove that the 2004 Will was the product of undue influence – which I do not believe they could do – there is no evidence that Wilma remained under the alleged influence of Mr. Fender at the time she executed the 2009 Will. In fact, the Petitioners do not even argue that Mr. Fender was aware of the 2009 Will, much less influenced its contents. Free from any possible influence from Mr. Fender, Wilma reviewed the contents of the 2004 Will and continued to name the Fenders as beneficiaries. For those reasons, I do not believe that I need separately to review the validity of the 2004 Will.